UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:20CR728 |
| | ) | |
| Plaintiff, | ) | SENIOR JUDGE |
| | ) | CHRISTOPHER A. BOYKO |
| vs. | ) | |
| | ) | |
| ADAM NAVEDO, | ) | OPINION AND ORDER |
| | ) | |
| Defendant. | ) | |

**CHRISTOPHER A. BOYKO, SR. J.:**

Defendant Adam Navedo – a suspected drug trafficker – moves to suppress the search of his Residence because the Affidavit at issue did not establish a nexus between any drug trafficking activities and the Residence.  (Docs. 24 & 28).  The Government opposes, arguing that Defendant's status as a drug dealer, plus evidence uncovered in Defendant's trash, established a nexus to the Residence.  (Doc. 30).

At first blush, this case may present "thorny constitutional issues."  The Court, however, ultimately finds that the issuing magistrate judge had a substantial basis to conclude that the Residence contained evidence of drug trafficking.  But even if the Affidavit were lacking, the investigators relied on the Search Warrant in good faith, which precludes the exclusion of evidence.

Accordingly, the Court **DENIES** Defendant's Motion to Suppress.

# I. BACKGROUND FACTS

On or about November 6, 2019, United States Drug Enforcement Administration ("DEA") Agent John Ferraraccio sought a warrant to search three "Target Locations:" (1) Co-Defendant Joshua Ocana's residence ("Target Location One"); (2) Defendant's purported business location, Revive Auto Detail & Tinting in Brook Park, Ohio ("Target Location Two"); and (3) Defendant's purported residence, located in Euclid, Ohio ("Target Location Three" or "the Residence").[1]  Law enforcement sought evidence of drug trafficking from each of these Target Locations.  In support of the Agent's request, he swore to a twenty-four-page affidavit ("the Affidavit"), from which the following facts are taken.

In 2018, the DEA identified Defendant and Ocana as possible drug traffickers during a separate investigation.  This led to a subsequent investigation specifically into Defendant and Ocana, which led investigators to believe the men were partners in a complex, multi-kilogram cocaine trafficking organization operating in the Greater Cleveland, Ohio area.  Defendant served as the head and Ocana operated as the second-in-command.  As the leader, agents believed Defendant would receive shipments of cocaine, distribute the same to resellers and dealers and oversee distribution efforts, including Ocana's.

The Affidavit recounts seven specific instances that happened during the investigation into Defendant and Ocana, beginning May 23, 2019 and ending November 6, 2019.  Some instances are more relevant for present purposes than others.  To assist their investigation, law enforcement enlisted a confidential source ("CS-1") to purchase narcotics from Defendant and

---

[1] The Affidavit stated that Kendra Jeffries is the registered owner of both Target Locations Two and Three. Investigators believed that Jeffries is Defendant's girlfriend.  And based on his training and experience, Agent Ferraraccio believed that Defendant utilized Jeffries's "name to acquire property and businesses, all in an attempt to hide from law enforcement."  (Doc. 30-1, PageID: 226, ¶ 66).

Ocana.  The Affidavit disclosed that CS-1 received monetary consideration in exchange for his or her cooperation.

The first relevant interaction took place between Ocana and CS-1.  Using government funds, CS-1 purchased two ounces of cocaine from Ocana at Target Location One.  After this controlled purchase, investigators followed Ocana, during which Ocana made another drug sale to an unidentified individual.  Ocana then left and met with Defendant at an apartment building, where agents believed Ocana gave Defendant the proceeds from the earlier sales.

Roughly a month later, CS-1 met Defendant at Target Location Two.  Investigators called this a "dry-meet" – a meeting where no drug sale is made but rather affords the source an opportunity to build a relationship with the target of the investigation.  Defendant and CS-1 discussed purchasing cocaine at multiple ounce level.  Unbeknownst to Defendant, CS-1 recorded this conversation.  And after listening to the conversation, investigators believed that Defendant led this drug trafficking organization, as Defendant set the price as he saw fit.

The "dry-meet" eventually led to a controlled purchase from Defendant.  On or about July 16, 2019,[2] CS-1 traveled to Target Location Two to purchase cocaine from Defendant.  Due to supply issues, Defendant had CS-1 wait until Defendant could get more.  Both CS-1 and Defendant eventually left Target Location Two, while investigators followed Defendant.  During the drive, Defendant engaged in multiple countersurveillance measures.  Investigators caught up with Defendant as he parked his car and entered a group of apartments.  Upon exiting the apartments, Defendant called CS-1 to let CS-1 know that Defendant secured more cocaine.  Again, that call was recorded.  According to the Agent, Defendant carefully described how he

---

[2] The heading of this section in the Affidavit states that the controlled purchase occurred in June of 2019.  The Court resolves this minor discrepancy by relying on the sworn, numbered paragraph in the Affidavit.

had the cocaine and agreed to meet with CS-1.  Ultimately, Defendant sold CS-1 two ounces of cocaine at Target Location Two.

 Later, on October 7,[3] investigators surveilled the Residence.  During that time, agents observed known vehicles of Defendant in the driveway.  The vehicles were driven by both Defendant and Defendant's girlfriend, Jeffries.  Law enforcement also observed Defendant at the Residence.  He left and investigators followed Defendant to the AT&T store.

A few days later, CS-1 placed a recorded phone call to Defendant.  The two discussed meeting up for a drug sale.  The sale never occurred, as CS-1 never met with Defendant that day.

Finally, on November 6, authorities went through the trash can outside the Residence.  Upon doing so, law enforcement found various items that reflected the presence of drug trafficking, including: money band wrapper for $2,000, brown tape, Saran Wrap, vacuum sealed packaging, electrical tape and opened vacuum-sealed packaging with coffee grounds interspersed therein.  Based on the Agent's experience, these items are "indicative of large scale, kilogram quantity drug trafficking."  (Doc. 30-1, PageID: 227, ¶ 70).[4]

Later that same day, Agent Ferraraccio sought a search warrant for all three Target Locations.  United States Magistrate Judge Jonathan Greenberg authorized the searches, which authorities executed that day.

As a result of the investigation, a Grand Jury indicted Defendant with five counts stemming from the alleged drug trafficking conspiracy, along with the unlawful possession of firearms.  (Doc. 12).  Defendant now seeks to suppress the evidence that investigators found at

---

[3] The Affidavit makes it clear that the investigation continued between Defendant's drug sale and this October 7 date.  The details of that investigation have been omitted in this Opinion as they deal with Defendant Ocana.

[4] The Agent also stated that the purpose of the coffee grounds was "to conceal the transportation of drugs from law enforcement officers and K-9s" as the grounds "mask the smell and odor" of the narcotics.  (Doc. 30-1, PageID: 227, ¶ 70).

the Residence.  (Docs. 24 & 28).[5]  The Government opposed (Doc. 30) and Defendant filed a

brief Reply (Doc. 31).

## II. LAW & ANALYSIS

### A.    Standard of Review

The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

Probable cause is defined as "reasonable grounds for belief, supported by less than prima

facie proof, but more than mere suspicion" and exists "when there is a 'fair probability' given the

totality of the circumstances, that contraband or evidence of a crime will be found in a particular

place."  *United States v. Lattner*, 385 F.3d 947, 951 (6th Cir. 2004), *cert. denied*, 543 U.S. 1095

(2005) (citing *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).

In *Illinois v. Gates*, the Supreme Court announced the basic standard for determining

whether an affidavit establishes probable cause to issue a search warrant:

> The task of the issuing magistrate is simply to make a practical,
> commonsense decision whether, ***given all the circumstances set
> forth in the affidavit*** before him [or her],…there is a fair probability
> that contraband or evidence of a crime will be found in a particular
> place.  And the duty of the reviewing court is simply to ensure that
> the magistrate had a substantial basis for concluding that probable
> cause existed.

426 U.S. 213, 238-39 (1983) (emphasis added); *see also United States v. Helton*, 314 F.3d 812,

819 (6th Cir. 2003); *Davidson*, 939 F.2d at 859.

---

[5] Defendant concedes that the Affidavit "may establish probable cause to search Targets #1 and #2[.]"  (Doc. 24, PageID: 156).

A finding of probable cause "should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236.  However, reviewing courts must ensure that the issuing magistrate or judicial officer did "not serve merely as a rubber stamp for the police."  *United States v. Leon*, 468 U.S. 897, 914 (1984) (quoting *Aguilar v. Texas*, 378 U.S. 108, 111 (1964)).  Further, reviewing courts "will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'"  *Id.* at 915 (quoting *Gates*, 462 U.S. at 239)).

Typically, a reviewing court concerns itself with only those facts which appear within the four corners of the affidavit.  *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1998) (citing *Whitley v. Warden*, 401 U.S. 560, 564-65 (1971)); *United States v. Hatcher*, 473 F.2d 321, 324 (6th Cir. 1973).  There is also a presumption of validity with respect to affidavits supporting search warrants.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  Finally, it is well-recognized that "affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation," and courts should "remain cautious not to interpret the language of affidavits in a hyper-technical manner."  *Weaver*, 99 F.3d at 1378 (citations omitted).

Defendant's attack on the Affidavit is multifaceted.  At base, he argues that the Affidavit does not provide a nexus between the alleged drug trafficking and the Residence.  He then attacks the evidentiary value of the "flimsy trash pull" because it did not produce any drugs and only contained common household items.  He also argues that certain evidence is stale.  Finally, Defendant claims Agent Ferraraccio made material omissions in his Affidavit by not including certain facts.  Ultimately then, Defendant argues for the suppression of evidence and claims that the good-faith exception to the exclusionary rule is inapplicable.

The Government argues that the totality of the circumstances described in the Affidavit provided probable cause to search the Residence.  The Affidavit facts demonstrated that Defendant dealt drugs and that he lived at the Residence.  Coupled with the evidence from the trash pull, the Magistrate Judge could infer the presence of drug trafficking evidence inside the Residence.  Moreover, Agent Ferraraccio did not leave any material facts out of the Affidavit.  And even if he did, the facts would not affect the probable cause analysis.  Finally, even if the Affidavit did not present probable cause, officers relied on the court-issued warrant in good faith, and thus, the evidence should not be suppressed.

**B.**  ***Franks v. Delaware* Hearing**

First, the Court must determine what facts to consider in deciding whether the Affidavit presented probable cause to search the Residence.  Generally, a court concerns itself only with those facts within the four corners of the affidavit.  *Weaver*, 99 F.3d at 1378.  Defendant, however, would like the Court to consider *additional facts* in its probable cause consideration.  According to Defendant, the Affidavit omitted material facts which, if included, would further illustrate the lack of probable cause and vitiate any good faith exception under *Leon*.  While Defendant initially listed a litany of omissions, he appears to shift his focus to one "material omission" – that investigators conducted a trash pull in August of 2019 at the Residence which resulted in nothing of evidentiary value.[6]  (Doc. 31. PageID: 231-32).

---

[6] In addition to this claim, Defendant also raised concerns over investigators not including: i) Defendant's criminal record; ii) recorded statements between CS-1 and Defendant about the Residence; iii) attempted controlled purchase(s) at the Residence; iv) observation of other drug dealers or users at the Residence; and v) heavy pedestrian traffic or complaints about the Residence.  Defendant's abandonment of these 'omissions' was wise.  First, as the Government pointed out, inclusion of some of these items would have harmed Defendant or been false statements, like Defendant's lack of criminal record (he has one).  And second, there is no difference between not including these 'omissions' and affirmatively stating these as 'facts' in the Affidavit.  Indeed, since the Affidavit did not mention any attempted controlled purchase at the Residence, it can be presumed that officers never took that investigate technique.  To have any significance for a *Franks* determination, Defendant would have to show that i) the officers attempted a controlled purchase at the Residence; ii) it never occurred or did not result in anything of

- 7 -

A hearing under *Franks v. Delaware* may be predicated on material omissions. *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001). But the Sixth Circuit has "recognized that an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkins*, 107 F.3d 1213, 1217 (6th Cir. 1997). To be entitled to a hearing, a defendant must (1) make "a substantial preliminary showing that the affiant engaged in a deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit; and (2) [show that] a finding of probable cause would not be supported by the affidavit if the omitted material were considered[.]" *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008); *see also United States v. Fisher*, 824 Fed. App'x 347, 253 (6th Cir. Aug. 19, 2020) (a defendant must show that the affiant, with an intention to mislead, excluded critical information from the affidavit, and the omission is critical to the finding of probable cause). Furthermore, in the case of a material omission, defendant faces a higher bar for obtaining a hearing as opposed to an allegedly false affirmative statement. *Fowler*, 535 F.3d at 415; *see also Graham*, 275 F.3d at 506 (a *Franks* hearing is only merited in cases of omissions in 'rare instances').

Defendant believes that Agent Ferraraccio purposefully misled the Magistrate Judge by not including the fact that authorities conducted a trash pull in August of 2019 that produced nothing of evidentiary value. This undermined a finding of probable cause, specifically the required nexus to the Residence. Defendant ultimately concludes that there is no valid reason for the Agent to omit this information.

Defendant has not hurdled the high bar he must cross in order to receive a *Franks* hearing. Nowhere does Defendant present facts to show that Agent Ferraraccio acted with an

---

evidentiary value; and iii) officers specifically intended to omit that information in order to deceive the issuing judge. Defendant has not made that showing.

intention to mislead Judge Greenberg.  Furthermore, Defendant cites no caselaw to support the notion that investigators must present everything they know at the time in the Affidavit.  That is not the requirement.  *See Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) (distinguishing between *Franks* and *Brady v. Maryland* obligations, ultimately finding that law enforcement has no "duty to disclose potentially exculpatory information…in the context of an application for a [search] warrant").

But even if the information were considered, it would not affect the ultimate outcome. That is largely because the lack of contraband does not change the probable-cause calculus. *Porter*, 774 Fed. App'x 978, 979 (6th Cir. Aug. 19, 2019).  Indeed, the Affidavit portrays Defendant as cautious – he engaged in countersurveillance techniques while driving; and he carefully discussed drug transactions in a cryptic manner.  Thus, it is unsurprising that he is careful with what he discards and when he discards it.

Additionally, the evidence Defendant wants to include would only bolster the DEA's investigation.  As will be discussed more fully below, Defendant attacks the November 6 trash pull because it contained innocuous, everyday items.  Defendant implies that investigators are making a mountain of a molehill and combining everyday items to support their theory of drug trafficking.  If this nefarious claim were true, the Court would expect law enforcement to do the same with the trash pull in August.  But they did not.  Instead, they found nothing of evidentiary value and continued with their investigation.  If anything, it reflects the Agent's honesty.

Finally, the Magistrate Judge considered the totality of the circumstances as of November of 2019.  Simply because evidence of drug trafficking was not in Defendant's trash can on August 21 – two and a half months prior to the Search Warrant – does not mean evidence of drug trafficking could not be found in the Residence on November 6, 2019.

Ultimately, Defendant has not presented a meritorious argument to expand the scope of Agent Ferraraccio's Affidavit. Defendant's challenge under *Franks* fails and the Court will focus on the 'four corners' of the Affidavit to determine whether probable cause existed to search the Residence.

## C.     Probable Cause Existed to Search the Residence

Defendant next argues that the Affidavit does not establish probable cause to search the Residence. He predicates his argument by attacking two underlying aspects of the Affidavit: 1) there was no nexus to connect any drug trafficking activity to the Residence; and 2) the lone trash-pull was insufficient to find probable cause. The Government counters and argues Defendant's status as a drug dealer, plus the evidence uncovered in the trash, provided the Magistrate Judge with a substantial basis to conclude that probable cause existed to search the Residence for evidence of drug trafficking.

Two general principles are at play in this case. The first concerns Defendant's status as a drug dealer. Courts in the Sixth Circuit "have struggled to identify the quantum of evidence needed to connect drug trafficking by an individual to a probability that evidence will be found at the individual's residence." *United States v. Reed*, 993 F.3d 441, 448 (6th Cir. 2021) (quoting *United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018)). Some "decisions suggests that courts generally may find a nexus to search a drug dealer's home 'even when there is absolutely no indication of any wrongdoing occurring there.'" *Id.* (quoting *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020)). Other decisions have rejected this proposition, and find that "the defendant's status as a drug dealer, standing alone, [does not] give[] rise to a fair probability that drugs will be found in his home." *Id.* (quoting *United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016)). These apparent conflicts in the law must be reconciled in fact-specific ways, by

looking at the totality of the circumstances of each case before the court.  *Id.*  But a general rule does emerge – "a court need not rely on a known drug dealer's status *alone* whenever other evidence (besides the dealer's living there) links the drug dealing to the dealer's home."  *Id.* (emphasis in original).  The Government relies largely on this first principle.  (Doc. 30, PageID: 196).

The second principle at play concerns the significance of evidence uncovered in the garbage outside of a residence.  Generally, trash pull evidence, *standing alone*, is insufficient to create probable cause to search a suspect's home.  *United States v. Abernathy*, 843 F.3d 243, 256-57 (6th Cir. 2016).  But when such evidence is "combined with other evidence of the resident's involvement in drug crimes," probable cause is routinely found to search the home.  *Id.* at 251-52 (collecting cases).  Defendant relies largely on this principle, claiming the Affidavit relies solely on the trash pull evidence.

But the facts in this case *combine* these two general principles.  And the Court finds that, after a review of all the facts alleged in the Affidavit, probable cause existed to search the Residence.  Both general principles above require 'something more' than just the lone piece of evidence.  And in this case, officers had the 'more' that allowed the Magistrate Judge to find probable cause to search the Residence.

First, the Affidavit provided probable cause that established Defendant as a drug dealer. It discussed Defendant's participation in a large drug-trafficking organization.  It demonstrated Defendant's supervision, as Ocana met with Defendant after engaging in two probable drug sales.  The Affidavit also alleged that Defendant personally sold drugs to CS-1, as well as discussed future sales.  In total then, the Affidavit provided a plethora of facts to support the theory that Defendant is a drug dealer.

- 11 -

With Defendant's status as a drug dealer established, investigators needed the 'more' before they could search the Residence. And they made that connection by discovering evidence of drug trafficking in the trash outside the Residence. Accordingly, investigators did not simply rely on Defendant's drug dealing status alone to search his Residence.

The above also provides the necessary facts to counter Defendant's theory of the case – that the authorities relied *solely* on the trash pull evidence to search the Residence. That is incorrect, as the investigation and facts reflected in the Affidavit demonstrated "the resident's involvement in drug crimes." *Abernathy*, 843 F.3d at 251-52. The Affidavit also connected Defendant to the Residence, with facts that Defendant's girlfriend owned the home, Defendant parked his vehicles at the home and Defendant ran errands from the home.[7] Again, law enforcement provided the 'more' necessary to substantiate the trash pull, as the Affidavit demonstrated Defendant's involvement in drug crimes.

Besides these two general principles, Defendant makes two additional arguments: i) that the trash-pull evidence was "flimsy;" and ii) that the Affidavit contained stale information. Defendant's attack on the trash evidence centers on the fact that investigators did not find any drugs. Rather, the items found are common household items that one can find in any trash can. Whether or not this fact is true, it does not affect the Court's probable cause analysis. The DEA's theory of the case was that Defendant led a multi-kilogram drug trafficking organization. Defendant is also portrayed as careful. Again, the fact that actual narcotics were not discovered in the trash is not unsurprising – a careful drug dealer would not flippantly dispose of his supply. Moreover, Agent Ferraraccio – an experienced investigator of drug crimes – noted the

---

[7] Defendant does not dispute the Affidavit's conclusion that Defendant lived at the Residence. Perhaps that is strategic, as distancing himself could implicate the Fourth Amendment's "standing" requirement. However, neither party presents that scenario.

significance of these 'common items' in combination with each other.  In the Agent's experience then, these items indicated the presence of a large-scale drug operation.[8]

Finally, the Affidavit did not contain stale information.  Defendant argues that the evidence of Defendant's drug sale in July of 2019 should not be considered because it occurred months before the trash pull.  In fact, law enforcement should not have even gone through Defendant's trash because officers did not have more recent evidence of drug activity.[9]  While Defendant is correct that an Affidavit may not employ 'stale' information, *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010), Agent Ferraraccio's Affidavit did not contain any stale facts.

Whether information is stale depends on the "inherent nature of the crime." *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998).  The following factors help when making a staleness determination:

> the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), [and] the place to be searched (mere criminal forum of convenience or secure operational base?)[.]

*Id.*  The Sixth Circuit has found that in the case of drug trafficking, the crime "is ongoing, the defendant's location is established, the drugs were likely to be [at the residence] for an indefinite period of time, and the [residence] to be searched constituted a secure operational base." *United States v. Hammond*, 351 F.3d 765, 772 (6th Cir. 2003).  The Circuit Court has also found that a

---

[8] Again, the conclusion Agent Ferraraccio reached based on the evidence uncovered in this trash pull demonstrates his reliability when considering the earlier trash pull that Defendant believes is a material omission.

[9] Officers do not need probable cause before rummaging through someone's trash can placed on the curb.  *See California v. Greenwood*, 486 U.S. 35 (1988) (the Fourth Amendment does not prohibit the warrantless search and seizure of garbage left for collection outside a home).  Thus, the intervening time between the drug sale and trash-pull has no bearing on whether detectives could go through Defendant's trash.

residence "is clearly a secure operational base." *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009) (in the context of child pornography crimes).

Here, the Affidavit did not employ stale information.  Law enforcement was investigating a large-scale drug trafficking operation, which is clearly a regenerating conspiracy.  Defendant had been entrenched in the community, operating since 2018 (at least) out of places of businesses and, as the trash pull reflects, his Residence.  Investigators were also looking for evidence of drug trafficking, which included money, ledgers, firearms and drugs.  Certainly money, ledgers, and firearms have an enduring utility to Defendant.  Finally, the Affidavit sought to search Defendant's home – placed in a girlfriend's name – which is a secure operational base.

Accordingly, Defendant's prior drug sale was clearly relevant in the investigation.  This evidence, coupled with other facts detailed in the Affidavit, led to the surveillance of Defendant's Residence.  Investigators took an additional investigatory technique by going through Defendant's trash.  Immediately then, authorities sought a warrant and executed a search within hours of uncovering the trash evidence.

Thus, the Affidavit did not employ stale information.  And the quality of the trash pull evidence cannot be seriously contested.  Instead, the facts demonstrated that Defendant was a drug dealer and that evidence in his trash reflected the presence of narcotics in his house.  Thus, the Affidavit presented a valid nexus between the drug trafficking activities and the Residence, and the Magistrate Judge had a substantial basis to conclude that evidence of drug trafficking would be uncovered in the Residence.

## D.    Good-Faith Exception

Even if probable cause did not exist to issue the Search Warrant, the evidence would not be excluded because the officers relied in good faith on the Search Warrant.  Defendant argues

against this outcome because the Affidavit is 'bare-bones' and Agent Ferraraccio's material omissions in the Affidavit.  The Government focuses more on the 'bare-bones' claim and argues that it was not.

The exclusionary rule – the court-developed remedy for Fourth Amendment violations, *see Mapp v. Ohio*, 367 U.S. 643, 654 (1961) – does not mechanically suppress evidence for every Fourth Amendment violation.  *United States v. Asgari*, 918 F.3d 509, 512 (6th Cir. 2019).  One exception exists when a judicial officer (like Judge Greenberg here) makes the independent decision that probable cause existed for the search.  *Reed*, 993 F.3d at 450.  In those cases, if an officer relies in good-faith on the court-issued search warrant, then the court should not bar evidence found, so long as four exceptions to the good-faith rule do not apply.  *Asgari*, 918 F.3d at 512; *United States v. Gilbert*, 952 F.3d 759, 763 (6th Cir. 2020) (*Leon* outlined four circumstances in which an officer's reliance would not be objectively reasonable).  Two circumstances are relevant here.

The first happens when the issuing judicial officer is misled by the affiant including false material in the affidavit.  *Leon*, 468 U.S. at 923 (citing *Franks*, 438 U.S. 154).  Here, Defendant does not allege that Agent Ferraraccio included false statements in his Affidavit.  In fact, there are no allegations of Agent Ferraraccio's mentality (i.e., no intent to deceive) whatsoever.  The only 'misleading' allegations concern the Agent's omissions of exculpatory information.  But as discussed above, those omissions do not rise to the level of a *Franks* violation.  Accordingly, *Leon*'s first exception to the good-faith rule is inapplicable.

A second scenario discussed in *Leon* involves situations where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923.  This exception commonly applies to affidavits that are "bare bones."

- 15 -

*United States v. Baker*, 976 F.3d 636, 647 (6th Cir. 2020).  A bare-bones affidavit is one that "merely states suspicions, or conclusions, without providing some underlying factual circumstances regarding the veracity, reliability and basis of knowledge."  *Gilbert*, 952 F.3d at 763.

 At the outset, Agent Ferraraccio's Affidavit in this case is not 'bare-bones.'  First, it is over twenty pages long and contains over seventy separate paragraphs.  And second, it contains numerous factual allegations, that the Agent then relied on in reaching certain conclusions based on his experience.  At this threshold level then, the Court cannot call this a bare-bones Affidavit.  *See Asgari*, 918 F.3d at 512 (The ten-page affidavit "was not the kind of 'bare bones' affidavit barred by *Leon*).

 But this is also true in the context of bare-bones affidavits and nexus considerations.  Even if an Affidavit does not satisfy a probable-cause nexus requirement, the affidavit will avoid the bare bones label so long as it identifies a 'minimally sufficient' nexus between the criminal activity and place to be searched.  *Reed*, 993 F.3d at 450.  The Sixth Circuit reminds courts of the "daylight" between a proper nexus for probable cause and a minimally sufficient one for *Leon*.  *Id.* at 450-51; *Gilbert*, 952 F.3d at 763 ("There must be daylight between the "bare bones" and "substantial basis" standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function").  And a minimally sufficient connection is "one in which there is 'some connection, regardless of how remote it may have been – some modicum of evidence, however slight – between the criminal activity at issue and the place to be searched.'"  *Reed*, 993 F.3d at 451 (quoting *United States v. McCoy*, 905 F.3d 409, 416 (6th 2018)).

The Sixth Circuit's recent opinion in *Reed* illustrates this point well.  There, the Sixth Circuit found that *Leon* allowed the introduction of evidence even after assuming the affidavit did not contain probable cause.  *Reed*, 993 F.3d at 449-50.  Four facts established this 'minimally sufficient connection:' 1) the affidavit established probable cause to believe that Reed dealt drugs and lived at his girlfriend's residence; 2) Sixth Circuit caselaw supported a nexus-finding between drug dealing activity and a dealer's residence; 3) investigators had experience in drug trafficking crimes and knew where dealers kept evidence of their activities; and 4) the law does not put an onerous burden on police officers to navigate "these frothy nexus waters" and apply general principles in various factual circumstances.  *Id.* at 451-53.

The same considerations apply in Defendant's case.  Agent Ferraraccio's Affidavit provided probable cause that Defendant dealt drugs and that he lived at the Residence.  Agent Ferraraccio described his experience with investigating drug crimes.  And the same Sixth Circuit caselaw supports the Agent's good faith in executing the Search Warrant.  But even more importantly – investigators had uncovered evidence in the trashcan outside of the Residence.  This fact provided 'some modicum of evidence' connecting the evidence of Defendant's drug dealing and the Residence.

Accordingly, because law enforcement relied in good faith on the Search Warrant, the Court declines to suppress the evidence.

### III. Conclusion

After considering the four-corners of the Affidavit, the Court concludes that the Magistrate Judge had a substantial basis to conclude that probable cause existed to search the Residence for evidence of drug trafficking.  But even if probable-cause were lacking, the

- 17 -

Affidavit offered a 'minimally sufficient' nexus to the Residence and thus the officers could rely in good faith on the Magistrate Judge's issuance of the Search Warrant.

Accordingly, Defendant's Motion to Suppress (Docs. 24 & 28) is **DENIED**.

**IT IS SO ORDERED.**

      s/ Christopher A. Boyko
**CHRISTOPHER A. BOYKO**
**Senior United States District Judge**

**Dated: May 19, 2022**

- 18 -